Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
William P. Nelson (Bar No. 196091)
william.nelson@tensegritylawgroup.com
TENSRGRITY LAW GROUP LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Tel: (650) 802-6000
Fax: (650) 802-6001

*Attorneys for Plaintiff Milestone
Entertainment, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MILESTONE ENTERTAINMENT, LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>ACTIVISION BLIZZARD, INC.,<br><br>          Defendant. | **Case No. 2:24-cv-04056**<br><br>**COMPLAINT FOR PATENT INFRINGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff Milestone Entertainment, LLC. ("Milestone") ("Plaintiff"), by and through its attorneys, files this Complaint for Patent Infringement against Defendant Activision Blizzard, Inc. ("Activision Blizzard" or "Defendant") and allege as follows:

## I.   NATURE OF THE ACTION

1.     This is an action for patent infringement of U.S. Patent Nos. 8,529,336 (the "336 Patent"), 11,335,164 (the "164 Patent"), 11,393,279 (the "279 Patent"), 10,650,635 (the "635 Patent"), 11,501,607 (the "607 Patent"), and 10,825,294 (the "294 Patent"), (collectively, the "Asserted Patents"). This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271.

## II.   THE PARTIES

2.     Plaintiff Milestone is incorporated under the laws of Delaware with its principal place of business at 1012 N. Roxbury Dr, Beverly Hills, California 90210, in the Central District of California.

3.     Randall "Randy" Katz, one of the named inventors of the patents asserted in this lawsuit, and the founder of Milestone, is a pioneer in the field of computerized gaming.  Prior to founding Milestone, Mr. Katz held several key positions in the entertainment industry at Sony Pictures Columbia Tri-Star Television and at legendary game show producer, Mark Goodson Productions. At Sony, Mr. Katz established and was president of a new division at Sony's Columbia TriStar Television Group devoted to developing lottery game shows and interactive games around the world. He worked closely with Sony's Game Show Network and Sony's Digital Media division who were responsible for creating new games and uses from famous games like Jeopardy! and Wheel of Fortune.

4.     Mr. Katz developed an expertise in how to structure games of chance, games of skill, and combinations of both into engaging and entertaining games that would be popular with the public on every type of screen. And when he was diagnosed with lymphoma in March 2003, he spent his time stuck in treatment envisioning the future of this industry and how they could be improved in the context of widespread

COMPLAINT

networks or internet connectivity. While these features described in the Asserted Patents are commonplace today and drive the widespread use and enjoyment of casual gaming on computing devices that has become a multi-billion dollar industry, they were anything but common in 2003 when conceived of by Mr. Katz. Consumer Broadband Internet access was in the early stages of deployment, and the launch of Apple's iPhone and high-speed mobile data services were several years away.

5. Mr. Katz envisioned networked games—of chance, of skill, and combinations of both—that can comply with the requisite parameters outlined by the game manufacturer, publisher, or regulator, and that also work in such a way that the structure and prizing of each game is also dynamically altered based on analyzed game play (such as the amount of time played, wins, losses, or other factors). Mr. Katz also envisioned the now-ubiquitous "virtual currency" systems that induce players to continue gameplay, by making game advancement possible through microtransactions or game bonuses. And Mr. Katz envisioned other game features that are also now commonplace in today's casual games, including imposing geographic, age, and time limits on game play, and establishing networked leaderboards and player groupings.

6. Defendant Activision Blizzard, Inc. ("Activision Blizzard") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 2701 Olympic Boulevard, Building B, Santa Monica, California 90404 in the Central District of California. Since October 13, 2023, Activision Blizzard is a wholly-owned subsidiary of Microsoft Corporation.

7. Activision Blizzard makes, uses, sells, offers to sell, exports, and/or imports in the United States products, services, and components that have been and are used to infringe one or more claims of the Asserted Patents.

## III.   JURISDICTION AND VENUE

8. Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set for herein.

9. This civil action for patent infringement arises under the patent laws of the

United States, 35 U.S.C § 1 *et seq.*, including in particular under 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.     This Court has personal jurisdiction over Defendant, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because Activision Blizzard has its principal place of business in, and resides in this district, and/or because Activision Blizzard has committed acts of infringement and has a regular and established place of business in this district.

## IV.   THE ASSERTED PATENTS

11.     On September 10, 2013, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,529,336 (the "336 Patent"), entitled "Apparatus, systems, and methods for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 336 Patent is attached to the Complaint as Exhibit A.

12.     Milestone is the owner of all right, title, and interest in and to the 336 Patent.

13.     The 336 Patent is directed to methods of dynamically altering computerized game play by altering the game structure or prizing parameters based on analysis of game play by the computer system.  Specifically, the claims recite games that feature a set of "mandated parameters" – a set of game objectives, such as win probability or rate, an amount of time played (engagement), overall prizing payout, or other metric the game designer seeks to achieve. *See, e.g.,* Ex. A (336 Patent), Claim 1.  User game play is tracked and analyzed, and on that basis, the game varies a set of game parameters (recited as "variable parameters"), such as the structure of the game (e.g., its difficulty, or game pieces provided) or its prizing, in order to achieve the mandated parameters.  *Id.*

14.     The elements claimed by the 336 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 336 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to dynamically alter the structure of networked

games, or their prizing, based on analysis of game play conditions. As the specification explains, this capability to analyze game play and programmatically alter the structure of the game solves a known problem in the field of computerized gaming – how to obtain a "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  336 Patent, 13:63-65.

15.    The written description of the 336 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 336 Patent. As the 336 Patent specification explains, "[e]xemplary mandated parameters may consist of prize pay out and win rates, and may include such factors as the minimum payout amount, the maximum payout amount, a defined percentage payout, the number of prizes, and/or the form of prizes. Within the system, the mandated parameters are generally input to the system, and preferably stored in memory within the system. Having received the mandated parameters, the system processor then selects among dependent variable parameters to implement game play and prizing in a way that achieve the mandated parameters. . . . Within these systems and methods, greater flexibility is achieved with regard to the play on a particular individual event, while achieving the mandated parameters for the game as a whole." *Id.* at 5:7-64.  "For a given game, there are numerous parameters, including the number of levels in a game, the decision points within the game and desired duration of the play experience. The play experience may be varied such as by awarding extended game play, providing free play awards, advancing a player one or more levels based upon game play and/or the provision of complex decisions. The game play experience may be varied by changing the play probabilities. In one implementation, game play experience may utilize real world probabilities for the game play portion of the experience, but utilize other

COMPLAINT

probabilities for the prizing portion of the overall game. By way of example, a simple probability game such a coin toss should emulate a 50/50 outcome experience as far as game play goes, but may be subject to a second prizing phase in which the mandated parameters can be achieved. For example, a prize board may be utilized to reduce the prizing payout to conform to the mandated parameters. Thus, the game play experience can feel as if the real world probabilities are being achieved, but the lower prizing payout be implemented as required by the mandated parameters. The player's win/lose experience may also be varied. For example, if the player must lose a individual game, the system may elect to give the user a loss, but one in which they appear to have come 'close' to winning a prize." *Id.* at 15:63-16:19.

16.     The claims of the 336 Patent thereby describe a technological solution to the problems of how to generate "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  For example, Claim 1 of the 336 Patent recites "receiving mandated parameters, the mandated parameters being those which must be achieved by the system as a whole", "a processing system coupled to the memory for implementing the mandated parameters by utilizing variable parameters, the processing system utilizing the variable parameters to achieve the mandated parameters," "performing game analytics on the game play events," and "varying the displays presented to the user to achieve the mandated parameters." *Id.* at Claim 1. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

17.     The systems and methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling dynamic modifications to the gameplay experience based on analysis of game play, the claims are directed to a specific, unconventional improvement to the way gaming computers operate.

18.     Dependent claims of the 336 Patent are further directed to specific,

unconventional improvements to the way gaming computers operate.  For example, Claims 12, 13, and 20 are directed to enabling cooperative or competitive play between "multiple users" in the context of dynamic modifications to game play, including leader boards.  Claims 18 and 19 are directed to user registration.  Claim 42 is directed to limiting game play to specific geographic regions. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

19.   On May 17, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,335,164 (the "164 Patent"), entitled "Systems for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 164 Patent is attached to the Complaint as Exhibit B.

20.   Milestone is the owner of all right, title, and interest in and to the 164 Patent.

21.   The 164 Patent is directed to methods of dynamically altering computerized game play by altering the game structure or prizing parameters based on analysis of game play by the computer system, and to the use of virtual currency obtained either through cash purchase or game play.  Specifically, the claims recite games that feature a set of "mandated parameters" – a set of game objectives, such as win probability or rate, an amount of time played (engagement), overall prizing payout, or other metric the game designer seeks to achieve. *See, e.g.,* Ex. B (164 Patent), Claim 1.  User game play is tracked and analyzed, and on that basis, the game varies a set of game parameters (recited as "variable parameters"), such as the structure of the game (e.g., its difficulty, or game pieces provided) or its prizing, in order to achieve the mandated parameters. *Id.* In addition, the game play includes "game play with virtual money (vCoins)", which can be acquired through cash purchase that is "subject to a multiplier" depending, for example, on the amount of real money spent. *Id.*

22.   The elements claimed by the 164 Patent, taken alone or in combination,

COMPLAINT

were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 164 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to dynamically alter the structure of networked games, or their prizing, based on analysis of game play conditions, and to provide virtual cash that is subject to a multiplier. As the specification explains, this capability to analyze game play and programmatically alter the structure of the game solves a known problem in the field of computerized gaming – how to obtain a "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  164 Patent, 14:56-58. As the specification explains, this varying multiplier for virtual currency similarly provides a particular solution to a specific problem in computerized gaming – that of maintaining player interest, either given other entertainment possibilities or the difficulty of the game:  "Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater."  164 Patent, 46:24-29.

23.    The written description of the 164 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 164 Patent. As the 164 Patent specification explains, "[e]xemplary mandated parameters may consist of prize pay out and win rates, and may include such factors as the minimum payout amount, the maximum payout amount, a defined percentage payout, the number of prizes, and/or the form of prizes. Within the system, the mandated parameters are generally inputted to the system, and preferably stored in memory within the system. Having received the mandated parameters, the system processor then selects

among dependent variable parameters to implement game play and prizing in a way that achieve the mandated parameters. . . . Within these systems and methods, greater flexibility is achieved with regard to the play on a particular individual event, while achieving the mandated parameters for the game as a whole." *Id.* at 5:30-6:23. "For a given game, there are numerous parameters, including the number of levels in a game, the decision points within the game and desired duration of the play experience. The play experience may be varied such as by awarding extended game play, providing free play awards, advancing a player one or more levels based upon game play and/or the provision of complex decisions. The game play experience may be varied by changing the play probabilities. In one implementation, game play experience may utilize real world probabilities for the game play portion of the experience, but utilize other probabilities for the prizing portion of the overall game. By way of example, a simple probability game such a coin toss should emulate a 50/50 outcome experience as far as game play goes, but may be subject to a second prizing phase in which the mandated parameters can be achieved. For example, a prize board may be utilized to reduce the prizing payout to conform to the mandated parameters. Thus, the game play experience can feel as if the real world probabilities are being achieved, but the lower prizing payout be implemented as required by the mandated parameters. The player's win/lose experience may also be varied. For example, if the player must lose an individual game, the system may elect to give the user a loss, but one in which they appear to have come 'close' to winning a prize." *Id.* at 16:60-17:17.

24.    As the 164 Patent specification further explains, a "vCoin will typically be a multiplier times the corresponding numeric monetary value, e.g. one dollar equals 500 vCoins. The multiplier is typically an integer number, and is usually an amount of 100, 500 or 1000, though any amount may be used. The multiplier may be fixed over time and over games, or it may vary based on factors, such as time, game or player status. For example, play during certain times may result in 'double vCoins'. Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps

COMPLAINT

weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater. . . .The vCoins may be traded for cash or other forms of games, prizes or non-cash goods or services. They may be traded into other forms either continuously (e.g., 956 vCoins may be redeemed for $9.56) or may be redeemed in quantized or discrete amounts, e.g., vCoins may only be redeemed in groups of 1,000, corresponding to $10. . . .vCoins provide the player with the perception of a big win since the numbers are larger than any corresponding monetary amount. Additionally, by being virtual and corresponding to electronic amounts, they may be altered or varied as desired. By being able to track specific coins, the vCoins technique leads to vastly expanded possibilities such as these." *Id.* at 46:16-47:3.

25.     The claims of the 164 Patent thereby describe a technological solution to the problems of how to generate "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  For example, Claim 1 of the 164 Patent recites "mandated and variable parameters for use in the course of game play, wherein the mandated parameters represent parameters which must be achieved by the system as a whole, and the variable parameters represent parameters characterizing at least one of: a game structure and a prizing structure," "a decision engine for performing game analytics on the game play," "implementing a first set of variable parameters to provide a first game play experience, and modifying the variable parameters to provide a second set of variable parameters providing a second game play experience, where the first game play experience differs from the second game play experience," "game play with virtual money (vCoins), the virtual money (vCoins) being acquired in response to a purchase utilizing the payment information of the users," and "the virtual money (vCoins) acquired in response to a purchase being subject to a multiplier." *Id.* at Claim 1. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

26.     The systems covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, inter alia, lacked these features. By enabling dynamic modifications to the gameplay experience based on analysis of game play, and the use of variable virtual currencies, the claims are directed to a specific, unconventional improvement to the way gaming computers operate.

27.     Dependent claims of the 164 Patent are further directed to specific, unconventional improvements to the way gaming computers operate.  For example, Claims 2, 3, and 4 are directed to user registration and player tracking. Claims 5-15 are directed to modifying game play parameters on the basis of "a threshold value to change from the first game play experience to the second game play experience" including specific game play experiences, including frequency of play, amount of money spent, the number of game plays since a last win. Claims 17, 26, and 27 are directed to limiting game play, including to specific geographic regions and based on time. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

28.     On July 19, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,393,279 (the "279 Patent"), entitled "System for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 279 Patent is attached to the Complaint as Exhibit C.

29.     Milestone is the owner of all right, title, and interest in and to the 279 Patent.

30.     The 279 Patent is directed to methods of dynamically altering computerized game play by altering the game structure or prizing parameters based on analysis of game play by the computer system.  Specifically, the claims recite games that feature a set of "mandated parameters" – a set of game objectives, such as win probability or rate, an amount of time played (engagement), overall prizing payout, or other metric the game designer seeks to achieve. *See, e.g.,* Ex. C (279 Patent), Claim 1.  User game play is

tracked and analyzed, and on that basis, the game varies a set of game parameters (recited as "variable parameters"), such as the structure of the game (e.g., its difficulty, or game pieces provided) or its prizing, in order to achieve the mandated parameters.  *Id.*

31.    The elements claimed by the 279 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 279 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to dynamically alter the structure of networked games, or their prizing, based on analysis of game play conditions. As the specification explains, this capability to analyze game play and programmatically alter the structure of the game solves a known problem in the field of computerized gaming – how to obtain a "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  279 Patent, 14:16-18.

32.    The written description of the 279 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 279 Patent. As the 279 Patent specification explains, "[e]xemplary mandated parameters may consist of prize pay out and win rates, and may include such factors as the minimum payout amount, the maximum payout amount, a defined percentage payout, the number of prizes, and/or the form of prizes. Within the system, the mandated parameters are generally input to the system, and preferably stored in memory within the system. Having received the mandated parameters, the system processor then selects among dependent variable parameters to implement game play and prizing in a way that achieve the mandated parameters. . . . Within these systems and methods, greater flexibility is achieved with regard to the play on a particular individual event, while achieving the mandated parameters for the game as a whole." *Id.* at 5:11-6:4. "For a

COMPLAINT

given game, there are numerous parameters, including the number of levels in a game, the decision points within the game and desired duration of the play experience. The play experience may be varied such as by awarding extended game play, providing free play awards, advancing a player one or more levels based upon game play and/or the provision of complex decisions. The game play experience may be varied by changing the play probabilities. In one implementation, game play experience may utilize real world probabilities for the game play portion of the experience, but utilize other probabilities for the prizing portion of the overall game. By way of example, a simple probability game such a coin toss should emulate a 50/50 outcome experience as far as game play goes, but may be subject to a second prizing phase in which the mandated parameters can be achieved. For example, a prize board may be utilized to reduce the prizing payout to conform to the mandated parameters. Thus, the game play experience can feel as if the real world probabilities are being achieved, but the lower prizing payout be implemented as required by the mandated parameters. The player's win/lose experience may also be varied. For example, if the player must lose a individual game, the system may elect to give the user a loss, but one in which they appear to have come 'close' to winning a prize." *Id.* at 16:22-46.

33. The claims of the 279 Patent thereby describe a technological solution to the problems of how to generate "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house. For example, Claim 1 of the 279 Patent recites memory to "store mandated and programmable variable parameters for use in the course of game play, wherein, the mandated parameters represent parameters which must be achieved by the system as a whole, and the programmable variable parameters represent parameters characterizing at least one of: a game structure and a prizing structure," and a "play engine" to "determine the selection of the first or second programmable variable parameter sets utilizing the recorded game play information with predefined criteria including at least one of: a game structure and a prizing structure."

*Id.* at Claim 1. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

34. The systems and methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling dynamic modifications to the gameplay experience based on analysis of game play, the claims are directed to a specific, unconventional improvement to the way gaming computers operate.

35. Dependent claims of the 279 Patent are further directed to specific, unconventional improvements to the way gaming computers operate.  For example, Claims 5-9 are directed to modifying game play parameters on the basis of various criteria, including wins, losses or other game outcomes.  Claims 11, 20 and 21 are directed to limiting game play, including to specific geographic regions and based on time.  Claims 25-30 define specific predefined criteria used as the basis to modify game play, including the amount of time played, the number of plays, and the number of wins. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

36. On May 12, 2020, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,650,635 (the "635 Patent"), entitled "Systems for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 635 Patent is attached to the Complaint as Exhibit D.

37. Milestone is the owner of all right, title, and interest in and to the 635 Patent.

38. The 635 Patent is directed to systems for computerized gaming making use of virtual currency obtained either through cash purchase or game play.  Specifically, the claims recite the game play includes "game play with virtual money", which can be acquired through cash purchase that is "subject to a multiplier" depending, for example,

on the amount of real money spent, or through game play.  *Id.*

39.     The elements claimed by the 635 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 635 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to provide virtual cash that is subject to a multiplier and can be used or acquired through game events. As the specification explains, this varying multiplier for virtual currency similarly provides a particular solution to a specific problem in computerized gaming – that of maintaining player interest, either given other entertainment possibilities or the difficulty of the game: "Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater."  635 Patent, 46:1-6.

40.     The written description of the 635 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 635 Patent.  As the 635 Patent specification explains, a "vCoin will typically be a multiplier times the corresponding numeric monetary value, e.g. one dollar equals 500 vCoins. The multiplier is typically an integer number, and is usually an amount of 100, 500 or 1000, though any amount may be used. The multiplier may be fixed over time and over games, or it may vary based on factors, such as time, game or player status. For example, play during certain times may result in 'double vCoins'. Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where

1  the real or perceived level of skill required is greater. . . .The vCoins may be traded for

2  cash or other forms of games, prizes or non-cash goods or services. They may be traded

3  into other forms either continuously (e.g., 956 vCoins may be redeemed for $9.56) or

4  may be redeemed in quantized or discrete amounts, e.g., vCoins may only be redeemed

5  in groups of 1,000, corresponding to $10. . . .vCoins provide the player with the

6  perception of a big win since the numbers are larger than any corresponding monetary

7  amount. Additionally, by being virtual and corresponding to electronic amounts, they

8  may be altered or varied as desired. By being able to track specific coins, the vCoins

9  technique leads to vastly expanded possibilities such as these." *Id.* at 45:60-46:47.

10  41.  The claims of the 635 Patent thereby describe a technological solution to

11  the problems of how to generate "higher level of audience interest and potential

12  participation" while maintaining a set of game objectives, such as win probability, or

13  overall prizing payout, that favors the house.  For example, Claim 1 of the 635 Patent

14  recites "game play with virtual money, the virtual money being acquired through:  (1)

15  game play and (2) cash purchase, the virtual money acquired by cash purchase being

16  subject to a multiplier," and "conversion of the virtual money into a non-cash good

17  comprising an image to permit advancement to another level within the game." *Id.* at

18  Claim 1. None of these elements, taken alone or in combination, were well-understood,

19  routine, or conventional to one of ordinary skill in the art at the time of the invention.

20  42.  The systems covered by the asserted claims, therefore, differ markedly

21  from the prior systems in use at the time of this invention, which, *inter alia*, lacked these

22  features. By enabling the use of variable virtual currencies, the claims are directed to a

23  specific, unconventional improvement to the way gaming computers operate.

24  43.  Dependent claims of the 635 Patent are further directed to specific,

25  unconventional improvements to the way gaming computers operate.  For example,

26  Claims 10, 14, 16, and 29 are directed to user registration, player tracking and leader

27  boards. Claims 3, 4, 5, 6, 7, and 8 describe how virtual coins may be acquired and used,

28  including through non-cash purchases, inducements, promotions, and advancement to

15                                   COMPLAINT

other levels of the game. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

44.     On November 15, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,501,607 (the "607 Patent"), entitled "Systems for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 607 Patent is attached to the Complaint as Exhibit E.

45.     Milestone is the owner of all right, title, and interest in and to the 607 Patent.

46.     The 607 Patent is directed to methods of dynamically altering computerized game play by altering the game structure or prizing parameters based on analysis of game play by the computer system, and to the use of virtual currency obtained either through cash purchase or game play.  Specifically, the claims recite games that feature a set of "mandated parameters" – a set of game objectives, such as win probability or rate, an amount of time played (engagement), overall prizing payout, or other metric the game designer seeks to achieve. *See, e.g.,* Ex. E (607 Patent), Claim 1.  User game play is tracked and analyzed, and on that basis, the game varies a set of game parameters (recited as "variable parameters"), such as the structure of the game (e.g., its difficulty, or game pieces provided) or its prizing, in order to achieve the mandated parameters. *Id.* In addition, the game play includes "game play with virtual money (vCoins)", which can be acquired through cash purchase that is "subject to a multiplier" depending, for example, on the amount of real money spent. *Id.*

47.     The elements claimed by the 607 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 607 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to dynamically alter the structure of networked games, or their prizing, based on analysis of game play conditions, and to provide virtual

cash that is subject to a multiplier. As the specification explains, this capability to analyze game play and programmatically alter the structure of the game solves a known problem in the field of computerized gaming – how to obtain a "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  607 Patent, 14:51-58. As the specification explains, this varying multiplier for virtual currency similarly provides a particular solution to a specific problem in computerized gaming – that of maintaining player interest, either given other entertainment possibilities or the difficulty of the game:  "Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater."  607 Patent, 46:21-26.

48.    The written description of the 607 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 607 Patent. As the 607 Patent specification explains, "[e]xemplary mandated parameters may consist of prize pay out and win rates, and may include such factors as the minimum payout amount, the maximum payout amount, a defined percentage payout, the number of prizes, and/or the form of prizes. Within the system, the mandated parameters are generally inputted to the system, and preferably stored in memory within the system. Having received the mandated parameters, the system processor then selects among dependent variable parameters to implement game play and prizing in a way that achieve the mandated parameters. . . . Within these systems and methods, greater flexibility is achieved with regard to the play on a particular individual event, while achieving the mandated parameters for the game as a whole." *Id.* at 5:30-6:23. "For a

given game, there are numerous parameters, including the number of levels in a game, the decision points within the game and desired duration of the play experience. The play experience may be varied such as by awarding extended game play, providing free play awards, advancing a player one or more levels based upon game play and/or the provision of complex decisions. The game play experience may be varied by changing the play probabilities. In one implementation, game play experience may utilize real world probabilities for the game play portion of the experience, but utilize other probabilities for the prizing portion of the overall game. By way of example, a simple probability game such a coin toss should emulate a 50/50 outcome experience as far as game play goes, but may be subject to a second prizing phase in which the mandated parameters can be achieved. For example, a prize board may be utilized to reduce the prizing payout to conform to the mandated parameters. Thus, the game play experience can feel as if the real world probabilities are being achieved, but the lower prizing payout be implemented as required by the mandated parameters. The player's win/lose experience may also be varied. For example, if the player must lose an individual game, the system may elect to give the user a loss, but one in which they appear to have come 'close' to winning a prize." *Id.* at 16:60-17:17.

49.     As the 607 Patent specification further explains, a "vCoin will typically be a multiplier times the corresponding numeric monetary value, e.g. one dollar equals 500 vCoins. The multiplier is typically an integer number, and is usually an amount of 100, 500 or 1000, though any amount may be used. The multiplier may be fixed over time and over games, or it may vary based on factors, such as time, game or player status. For example, play during certain times may result in 'double vCoins'. Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater. . . .The vCoins may be traded for cash or other forms of games, prizes or non-cash goods or services. They may be traded

into other forms either continuously (e.g., 956 vCoins may be redeemed for $9.56) or may be redeemed in quantized or discrete amounts, e.g., vCoins may only be redeemed in groups of 1,000, corresponding to $10. . . .vCoins provide the player with the perception of a big win since the numbers are larger than any corresponding monetary amount. Additionally, by being virtual and corresponding to electronic amounts, they may be altered or varied as desired. By being able to track specific coins, the vCoins technique leads to vastly expanded possibilities such as these." *Id.* at 46:13-67.

50.     The claims of the 607 Patent thereby describe a technological solution to the problems of how to generate "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  For example, Claim 1 of the 607 Patent recites "mandated and variable parameters for use in the course of game play, wherein the mandated parameters represent parameters which must be achieved by the system as a whole, and the variable parameters represent parameters characterizing at least one of: a game structure and a prizing structure," "a decision engine for performing game analytics on the game play and determine the selection of the first or second programmable variable parameters utilizing the recorded game play information with predefined criteria," "implementing a first variable parameters to provide a first game play experience, and modifying the variable parameters to provide second variable parameters providing a second game play experience, where the first game play experience differs from the second game play experience," "game play with virtual money (vCoins), the virtual money (vCoins) being acquired in response to a purchase utilizing the payment information of the users," and "the virtual money (vCoins) acquired in response to a purchase being subject to a multiplier." *Id.* at Claim 1. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

51.     The systems covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these

features. By enabling dynamic modifications to the gameplay experience based on analysis of game play, and the use of variable virtual currencies, the claims are directed to a specific, unconventional improvement to the way gaming computers operate.

52.   Dependent claims of the 607 Patent are further directed to specific, unconventional improvements to the way gaming computers operate.  For example, Claims 16 and 17 are directed to limiting game play, including based on time. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

53.   On November 3, 2020, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,825,294 (the "294 Patent"), entitled "Systems for implementing enhanced gaming and prizing parameters in an electronic environment," to Randall M. Katz and Gary Dawson. A copy of the 294 Patent is attached to the Complaint as Exhibit F.

54.   Milestone is the owner of all right, title, and interest in and to the 294 Patent.

55.   The 294 Patent is directed to systems for computerized gaming making use of virtual currency obtained either through cash purchase or game play.  Specifically, the claims recite the game play includes "game play with virtual money", which can be acquired through cash purchase that is "subject to a multiplier" depending, for example, on the amount of real money spent, or through game play. *Id.*

56.   The elements claimed by the 294 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. Rather, the 294 Patent claims and teaches, *inter alia*, an unconventional way to use a computer to provide virtual cash that is subject to a multiplier and can be used or acquired through game events. As the specification explains, this varying multiplier for virtual currency similarly provides a particular solution to a specific problem in computerized gaming – that of maintaining player interest, either given other entertainment possibilities or the difficulty of the game:

"Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater."  294 Patent, 46:4-9.

57.    The written description of the 294 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 294 Patent.  As the 294 Patent specification explains, a "vCoin will typically be a multiplier times the corresponding numeric monetary value, e.g. one dollar equals 500 vCoins. The multiplier is typically an integer number, and is usually an amount of 100, 500 or 1000, though any amount may be used. The multiplier may be fixed over time and over games, or it may vary based on factors, such as time, game or player status. For example, play during certain times may result in 'double vCoins'. Enhanced multipliers may be used to induce play at times when other entertainment is available, e.g., sweeps weeks or prime time, as an inducement for the player to play the subject games. The multiplier may change for different games, such as where the multiplier increases where the real or perceived level of skill required is greater. . . .The vCoins may be traded for cash or other forms of games, prizes or non-cash goods or services. They may be traded into other forms either continuously (e.g., 956 vCoins may be redeemed for $9.56) or may be redeemed in quantized or discrete amounts, e.g., vCoins may only be redeemed in groups of 1,000, corresponding to $10. . . .vCoins provide the player with the perception of a big win since the numbers are larger than any corresponding monetary amount. Additionally, by being virtual and corresponding to electronic amounts, they may be altered or varied as desired. By being able to track specific coins, the vCoins technique leads to vastly expanded possibilities such as these." *Id.* at 45:63-46:50.

58.     The claims of the 294 Patent thereby describe a technological solution to the problems of how to generate "higher level of audience interest and potential participation" while maintaining a set of game objectives, such as win probability, or overall prizing payout, that favors the house.  For example, Claim 1 of the 294 Patent recites "game play with virtual money, (b) the virtual money being acquired through: (1) game play and (2) purchase," "(c) the virtual money acquired by cash purchase being subject to a multiplier," and "(d) conversion of the virtual money into a non-cash good comprising an image, the image to permit advancement to another level within the game." *Id.* at Claim 1. None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

59.     The systems covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling the use of variable virtual currencies, the claims are directed to a specific, unconventional improvement to the way gaming computers operate.

60.     Dependent claims of the 294 Patent are further directed to specific, unconventional improvements to the way gaming computers operate.  For example, Claims 3, 4, 5, 6, describe how virtual coins may be acquired and used, including through non-cash purchases, inducements.  None of these elements, taken alone or in combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention.

61.     The 336 Patent, 164 Patent, 279 Patent, 635 Patent, 607 Patent, and 294 Patent (collectively the "Asserted Patents") are valid and enforceable.

## V.     THE INFRINGING PRODUCTS

62.     Defendant's computer games for use on iOS and Android mobile devices, and personal computers (including on web browsers and Facebook) including but not limited to: Candy Crush Saga, and Call of Duty: Mobile, practice claimed inventions of the Asserted Patents (hereinafter, the "Accused Products").  In connection with the

Accused Products, Defendant performs in the United States without authority every step of the patented inventions; and makes, uses, sells, and/or offers to sell in the United States without authority software that, when installed on a computing device meets each and every limitation of the asserted claims.

63. For example, when installed on a mobile device, Call of Duty: Mobile uses the device processor to generate game play information, including game play with virtual money. Call of Duty: Mobile uses virtual money, including "COD Points" (a/k/a "CP"). The money is "virtual" because it has no real-world counterpart, and no consistently defined relationship to any real currency.



COMPLAINT



64. In Call of Duty: Mobile, virtual money can be acquired through game play, including by advancing through tiers based on repeated play with a battle pass.

1
2
3
4
5
6
7
8
9
10
11
12



13

## How to Get COD Points in Call of Duty

14
15  You may struggle to get lots of COD points if you don't want to spend real money. The
     easiest way however would be to **earn them through game play** and this includes
16  purchasing the season 1 Battle Pass. This will set you back around $9.99 in the store.

17  When you unlock the Battle Pass, you get COD points through unlocking the tires and
     completing the challenges. Leveling up the Battle Pass will earn you around 800 CP, and
18  this is enough to get to the next season of Battle Pass.

19  Throughout the progression of the Battle Pass, you will keep **earning various award**s and
20  you can then choose to spend these on the COD points that are available in the store.

21  Additionally, the game runs special offers of COD points occasionally, so just keep an eye
22  out for this.

23      65.    In Call of Duty: Mobile, the virtual money acquired by cash purchase is
24  subject to a multiplier, such that larger amounts of cash purchase produce
25  disproportionately larger amounts of virtual money in relation to lower cash amounts.
26
27
28





66.     As another example, on information and belief, Candy Crush Saga stores mandated parameters for use in game play that represent threshold game play objectives the game is desired to achieve, including parameters relating to the frequency and amount of game play per player, and the frequency and amount of in-game purchases per player. For example, Candy Crush Saga tracks the number of monthly average users (MAUs, defined by Activision-Blizzard as the number of players accessing the game within the last 30 days), and in-game net bookings. *See*

COMPLAINT

https://investor.activision.com/news-releases/news-release-details/activision-blizzard-announces-fourth-quarter-and-2021-financial.

67.     Candy Crush Saga also tracks win rates for each level, and in-game purchases for each level.



68.     On information and belief, Candy Crush tracks numerous aspects of game play for use as mandated parameters, or thresholds the game seeks to achieve, such as the frequency of play, the total amount of time played in a given period, the amount of time since the last play, the win/loss rate, the number of plays on a given level since the last win, the rate of progression through game levels, the number of in-game purchases, and the frequency of in-game purchase.

69.     In addition, Candy Crush stores alterable variable parameters defining both the game play and prizing structure.  These parameters define, *e.g.,* how the game is played, the likelihood of a win, and the prizes awarded for a defined win.  These parameters are "variable" in that they may be programmatically and dynamically altered.  On information and belief, the variable parameters that define the game and prizing

structure are altered when one or more threshold levels of the mandated parameters concerning engagement and in-game purchases are met or crossed.

70.     For example, Candy Crush Saga alters the composition of the opening and in-play game board, and alters the likelihood of obtaining special items during game play, in order to increase the chances of completing a level in the game.



71.     For example, Candy Crush alters the likelihood of obtaining more powerful special items in mini-games, and varies the frequency of mini-games and bonuses, in order to increase the chances of completing a level in the game.



72.    For example, Candy Crush initially offers players, upon a loss, the ability to either purchase additional moves to complete the level, or watch an advertisement to obtain additional moves.  Following any in-game purchase, the advertising option is removed, and the player's only option is to pay to keep playing.

**Prior to first purchase    Following first purchase**



COMPLAINT

73.    For example, Candy Crush alters the prizing structure by offering players discounted purchases of special items for "hard levels" based on previous player experience.



74.    In the interest of providing detailed averments of infringement, Plaintiff has identified below at least one claim per patent-in-suit to demonstrate infringement by at least one product. However, the selection of claims and products below should not be considered limiting, and infringement by Activision Blizzard by way of additional claims of the Asserted Patents and additional products will be disclosed in compliance with the Court's rules related to infringement contentions and/or discovery. The allegations provided herein are exemplary and without prejudice to Plaintiff's infringement contentions to be provided pursuant to the Court's scheduling order, local rules, and/or discovery procedures. Plaintiff's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order, local rules, and/or discovery procedures. As detailed below, each element of at

least one claim of each of the patents-in-suit is literally present in at least one accused product. To the extent that any element is not literally present, each such element is present under the doctrine of equivalents. Plaintiff's analysis below should not be taken as an admission and/or contention that the preamble for any claim is or is not limiting. While publicly available information is cited below, Plaintiff may rely on other forms of evidence to show infringement.

**VI.   COUNT I (INFRINGEMENT OF U.S. PATENT NO. 8,529,336)**

75.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

76.   Upon information and belief, Activision Blizzard has directly infringed at least Claims 1, 3, 4, 5, 13, 18, 19, 20, 22, 24, 25, 26, 29, 42, 44, 45, 46, 47, and 50, of the 336 Patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by performing in the United States without authority each and every step of the claims by using devices that embody the patented invention, namely, the Accused Products installed or operating on a computing device. For example, Activision Blizzard directly infringes at least these claims of the 336 Patent when its software performs each element of the claimed methods, such as when Activision Blizzard operates the Accused Products for internal testing and development.

77.   For example, the Accused Products perform the method of Claim 1 because they provide a method for electronic interaction with users of the system, *i.e.,* game play on a computing device.  For example, Candy Crush Saga enables users to interact with a multi-level game, as shown below.

31                        COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14    78.    The Accused Products perform the step of receiving mandated parameters,

15    the mandated parameters being those which must be achieved by the system as a whole,

16    as recited in Claim 1.  For example, on information and belief, Candy Crush Saga tracks

17    numerous aspects of game play for use as mandated parameters, or thresholds the game

18    seeks to achieve, such as the frequency of play, the total amount of time played in a

19    given period, the amount of time since the last play, the win/loss rate, the number of

20    plays on a given level since the last win, the rate of progression through game levels, the

21    number of in-game purchases, and the frequency of in-game purchase.

22    79.    On information and belief, the Accused Products perform the step of storing

23    in a memory coupled to the input at least the mandated parameters, as recited in Claim

24    1.  For example, on information and belief, Candy Crush Saga utilizes the memory of

25    the device it is installed on to store the mandated parameters described above, and/or

26    stores them in a server environment operated by Defendant.

27    80.    On information and belief, the Accused Products perform the step of

28    processing in a processing system coupled to the memory for implementing the

mandated parameters by utilizing variable parameters, the processing system utilizing the variable parameters to achieve the mandated parameters, as recited in Claim 1. For example, on information and belief, Candy Crush Saga stores alterable variable parameters defining both the game play and prizing structure.  These parameters define, *e.g.,* how the game is played, the likelihood of a win, and the prizes awarded for a defined win.   These parameters are "variable" in that they may be programmatically and dynamically altered.  On information and belief, the variable parameters that define the game and prizing structure are altered when one or more threshold levels of the mandated parameters concerning engagement and in-game purchases are met or crossed.

81.    For example, Candy Crush Saga alters the composition of the opening and in-play game board, and alters the likelihood of obtaining special items during game play, in order to increase the chances of completing a level in the game.



82.    For example, Candy Crush alters the likelihood of obtaining more powerful special items in mini-games, and varies the frequency of mini-games and bonuses, in order to increase the chances of completing a level in the game.

1
2
3
4
5
6
7
8
9
10
11
12
13



14    83.     For example, Candy Crush initially offers players, upon a loss, the ability

15 to either purchase additional moves to complete the level or watch an advertisement to

16 obtain additional moves.  Following any in-game purchase, the advertising option is

17 removed, and the player's only option is to pay to keep playing.

18                  **Prior to first purchase   Following first purchase**

19
20
21
22
23
24
25
26
27
28



34                                                          COMPLAINT

84.    For example, Candy Crush alters the prizing structure by offering players discounted purchases of special items for "hard levels" based on previous player experience.



85.    On information and belief, the Accused Products perform the step of storing information regarding particular game play events as determined by the processor, as recited in Claim 1.  For example, Candy Crush Saga tracks the number of monthly average users (MAUs, defined by Activision-Blizzard as the number of players accessing the game within the last 30 days), and in-game net bookings.  *See* https://investor.activision.com/news-releases/news-release-details/activision-blizzard-announces-fourth-quarter-and-2021-financial.

86.    Candy Crush Saga also tracks win rates for each level, and in-game purchases for each level.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14    87.    On information and belief, the Accused Products perform the step of
15  generating presentations for at least displaying game play events, as recited in Claim 1.
16  For example, Candy Crush Saga displays game play events during game play.

17
18
19
20
21
22
23
24
25
26
27
28



88.    The Accused Products perform the step of performing game analytics on the game play events, as recited in Claim 1.  For example, as described above, Candy Crush Saga tracks win rates for each level, and in-game purchases for each level.

89.    The Accused Products perform the step of varying the displays presented to the user to achieve the mandated parameters, as recited in Claim 1.  For example, on information and belief, the variable parameters that define the game and prizing structure of Candy Crush Saga are altered when one or more threshold levels of the mandated parameters concerning engagement and in-game purchases are met or crossed.

90.    For example, Candy Crush Saga alters the composition of the opening and in-play game board, and alters the likelihood of obtaining special items during game play, in order to increase the chances of completing a level in the game.



91.    For example, Candy Crush alters the likelihood of obtaining more powerful special items in mini-games, and varies the frequency of mini-games and bonuses, in

order to increase the chances of completing a level in the game.



92.     For example, Candy Crush initially offers players, upon a loss, the ability to either purchase additional moves to complete the level, or watch an advertisement to obtain additional moves.  Following any in-game purchase, the advertising option is removed, and the player's only option is to pay to keep playing.

**Prior to first purchase**     **Following first purchase**



38                                               COMPLAINT

93.     For example, Candy Crush alters the prizing structure by offering players discounted purchases of special items for "hard levels" based on previous player experience.



94.     Accordingly, the Accused Products perform each and every step of exemplary Claim 1 of the 336 Patent.

95.     Activision Blizzard's acts of infringement cause damage to Plaintiff, and Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

96.     Activision Blizzard's acts of infringement, unless restrained and enjoined, will cause irreparable injury and damage to Plaintiff for which there is no adequate remedy at law.

97.     Activision Blizzard's infringement of the Asserted Patents is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

1    **VII.   COUNT II (INFRINGEMENT OF U.S. PATENT NO. 11,335,164)**

2         98.    Plaintiff repeats and realleges the allegations in the preceding paragraphs

3    as though fully set forth herein.

4         99.    Upon information and belief, Activision Blizzard has directly infringed at

5    least Claims 1, 2, 4, 5, 6, 7, 9, 11, 12, 13, 15, 19, 23, 24, and 29 of the 164 Patent in

6    violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by

7    making, using, selling, and/or offering to sell in the United States without authority

8    products which meet each limitation of the asserted claims, namely, the Accused

9    Products installed or operating on a computing device, including operating servers to

10   support the infringing game play. For example, Activision Blizzard directly infringes at

11   least these claims of the 164 Patent when its software is installed on a computing

12   platform, such as when Activision Blizzard operates the Accused Products for internal

13   testing and development.

14        100.   For example, the Accused Products meet the system of Claim 1 of the 164

15   Patent because, when installed or operating on a computing device, they provide a

16   system for electronic game play involving one or more remote users of a system in an

17   electronic environment, the remote users utilizing electronic communication devices

18   having display capabilities, the electronic communication devices having input

19   capability and generate an output corresponding to the input, the electronic

20   communication devices having storage to store information from a remote source  For

21   example, Candy Crush Saga when installed on a computing device enables electronic

22   game play for remote users, including display, input, and output, as shown below.

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



13    101.   The Accused Products meet the limitation of a server including memory to

14  process and store: registration user information of the remote users, payment information

15  of the remote users, as recited in Claim 1.   For example, as described above, on

16  information and belief, Candy Crush Saga utilizes servers that store player registration

17  and payment information, as demonstrated by the requirement of Internet connectivity

18  for user purchases and player information across platforms:

19
20
21
22
23
24
25
26
27
28

41                                    COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13   102.   The Accused Products meet the limitation of a server including memory to

14   store mandated and variable parameters for use in the course of game play, wherein the

15   mandated parameters represent parameters which must be achieved by the system as a

16   whole, and the variable parameters represent parameters characterizing at least one of:

17   a game structure and a prizing structure, as recited in Claim 1.

18   103.   For example, on information and belief, Candy Crush Saga tracks

19   numerous aspects of game play for use as mandated parameters, or thresholds the game

20   seeks to achieve, such as the frequency of play, the total amount of time played in a

21   given period, the amount of time since the last play, the win/loss rate, the number of

22   plays on a given level since the last win, the rate of progression through game levels, the

23   number of in-game purchases, and the frequency of in-game purchase.

24   104.   For example, on information and belief, Candy Crush Saga stores alterable

25   variable parameters defining both the game play and prizing structure.  These parameters

26   define, *e.g.,* how the game is played, the likelihood of a win, and the prizes awarded for

27   a defined win.  These parameters are "variable" in that they may be programmatically

28   and dynamically altered.  On information and belief, the variable parameters that define

1  the game and prizing structure are altered when one or more threshold levels of the

2  mandated parameters concerning engagement and in-game purchases are met or crossed.

3      105.   For example, Candy Crush Saga alters the composition of the opening and

4  in-play game board, and alters the likelihood of obtaining special items during game

5  play, in order to increase the chances of completing a level in the game.



19     106.   For example, Candy Crush alters the likelihood of obtaining more powerful

20  special items in mini-games, and varies the frequency of mini-games and bonuses, in

21  order to increase the chances of completing a level in the game.

COMPLAINT



107.   For example, Candy Crush initially offers players, upon a loss, the ability to either purchase additional moves to complete the level, or watch an advertisement to obtain additional moves.  Following any in-game purchase, the advertising option is removed, and the player's only option is to pay to keep playing.

**Prior to first purchase   Following first purchase**



COMPLAINT

108.   For example, Candy Crush alters the prizing structure by offering players discounted purchases of special items for "hard levels" based on previous player experience.



109.   The Accused Products meet the limitation of a communication interface adapted to couple bi-directional communications between the one or more remote users utilizing electronic communication devices, as recited in Claim 1.  For example, Candy Crush Saga enables end user devices to transmit game information to server computers operated by Defendant, and receive game information as well.

1
2
3
4
5
6
7
8
9
10
11
12



13   110.   The Accused Products meet the limitation of a game processor coupled to
14 memory generating game play information, the game processor providing at least: the
15 game play information including game play with virtual money (vCoins), the virtual
16 money (vCoins) being acquired in response to a purchase utilizing the payment
17 information of the users, as recited in Claim 1. For example, Candy Crush Saga provides
18 "Gold Bars", which are virtual money that can be acquired through game play, or
19 through purchase, and can be used to obtain various game items, as explained in support
20 pages for the game:

21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    111.   The Accused Products meet the limitation of the virtual money (vCoins)
18 acquired in response to a purchase being subject to a multiplier, as recited in Claim 1.
19 For example, cash purchases of Candy Crush Saga's "Gold Bars" are subject to a
20 multiplier, as shown below, where 10 bars are available for $1.99, and 50 bars are
21 available for $7.99.
22
23
24
25
26
27
28

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13   112.   The Accused Products meet the limitation of implementing a first set of
14   variable parameters to provide a first game play experience, and modifying the variable
15   parameters to provide a second set of variable parameters providing a second game play
16   experience, where the first game play experience differs from the second game play
17   experience, as recited in Claim 1.

18   113.   For example, on information and belief, Candy Crush Saga stores alterable
19   variable parameters defining both the game play and prizing structure.  These parameters
20   define, *e.g.,* how the game is played, the likelihood of a win, and the prizes awarded for
21   a defined win.  These parameters are "variable" in that they may be programmatically
22   and dynamically altered.  On information and belief, the variable parameters that define
23   the game and prizing structure are altered when one or more threshold levels of the
24   mandated parameters concerning engagement and in-game purchases are met or crossed.

25   114.   For example, Candy Crush Saga alters the composition of the opening and
26   in-play game board, and alters the likelihood of obtaining special items during game
27   play, in order to increase the chances of completing a level in the game.

28



115.   For example, Candy Crush alters the likelihood of obtaining more powerful special items in mini-games, and varies the frequency of mini-games and bonuses, in order to increase the chances of completing a level in the game.




COMPLAINT

116.   For example, Candy Crush Saga initially offers players, upon a loss, the ability to either purchase additional moves to complete the level, or watch an advertisement to obtain additional moves.   Following any in-game purchase, the advertising option is removed, and the player's only option is to pay to keep playing.

**Prior to first purchase   Following first purchase**



117.   For example, Candy Crush alters the prizing structure by offering players discounted purchases of special items for "hard levels" based on previous player experience.

50                                                          COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14      118.   The Accused Products meet the limitation of memory storing account
15  information which varies through game play, as recited in Claim 1.  For example, Candy
16  Crush Saga stores information about registered players, including their identity, and the
17  number of player points and special items accrued, which varies during game play.

18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14   119.   The Accused Products meet the limitation of a decision engine for
15   performing game analytics on the game play, as recited in Claim 1.  For example, Candy
16   Crush Saga tracks the number of monthly average users (MAUs, defined by Activision-
17   Blizzard as the number of players accessing the game within the last 30 days), and in-
18   game net bookings.   *See*  https://investor.activision.com/news-releases/news-release-
19   details/activision-blizzard-announces-fourth-quarter-and-2021-financial.  Candy Crush
20   Saga also tracks win rates for each level, and in-game purchases for each level.

21
22
23
24
25
26
27
28

COMPLAINT



120.    On information and belief, Candy Crush tracks numerous aspects of game play, such as the frequency of play, the total amount of time played in a given period, the amount of time since the last play, the win/loss rate, the number of plays on a given level since the last win, the rate of progression through game levels, the number of in-game purchases, and the frequency of in-game purchase.

121.    The Accused Products meet the limitation of a prizing system to award a win to the one or more remote users determined by a prizing structure, as recited in Claim 1.  For example, Candy Crush Saga maintains a prizing structure that awards wins to game players in regular game play, daily and other periodic bonuses, and mini-games:

1
2
3
4
5
6
7
8
9
10
11
12
13

 

14
15    122.   Accordingly, the Accused Products meet each and every limitation of exemplary Claim 1 of the 164 Patent.

16    123.   On information and belief, Activision Blizzard has induced and continues
17    to induce infringement of claims of the 164 Patent pursuant to 35 U.S.C. § 271(b),
18    including at least Claims  1, 2, 4, 5, 6, 7, 9, 11, 12, 13, 15, 19, 23, 24, and 29, by
19    encouraging its customers and other third parties to make and use the claimed systems,
20    such as by installing and using the Accused Products to play games that utilize mandated
21    parameters and variable parameters to dynamically alter game play by altering the game
22    structure or prizing parameters based on analysis of game play by the computer system,
23    and that utilize virtual currency obtained either through cash purchase or game play.

24    124.   Such conduct constitutes infringement, literally or under the doctrine of
25    equivalents, of one or more claims of the 164 Patent by such third parties. Activision
26    Blizzard's acts of encouragement include: providing and intending that third parties use
27    the Accused Products to play games; purposefully and voluntarily placing the Accused
28    Products that utilize mandated parameters and variable parameters to dynamically alter

COMPLAINT

game play by altering the game structure or prizing parameters based on analysis of game play by the computer system, and utilize virtual currency, in the stream of commerce with the expectation that they will be used by customers. For example, Activision Blizzard makes Candy Crush Saga available on "app stores" for iOS and Android, and on Facebook, so that users will download and play the game, resulting in infringement.  As another example, Activision Blizzard provides FAQs and support documents explaining how to play Candy Crush Saga in a manner that results in infringement:

The Color Bomb might be the most Special Candy in the game!  It will boost your gameplay, and it's great to tackle blockers and collect orders.

How can I create one?

To create a Color Bomb, just match **five Candies in a row or column**:



https://candycrush.zendesk.com/hc/en-us/articles/13940218109469-Learn-all-about-the-Color-Bomb#%20.

125.   As another example, Activision Blizzard provides support and instruction in using Candy Crush Saga in a manner that infringes, including how to obtain and use vCoins through cash purchase or game play:

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      126.    Furthermore, Activision Blizzard has actual knowledge of how the Accused

17   Products infringe when used in this manner, including when they are used by customers.

18   Activision Blizzard has undertaken these acts of encouragement with the specific intent

19   that end-users use such Accused Products as intended by Activision Blizzard in a manner

20   that infringes the asserted claims of the 164 Patent. Activision Blizzard proceeded in this

21   manner despite its actual knowledge of the 164 Patent and that the specific actions it is

22   actively inducing on the part of its customers and other third parties constitute

23   infringement of the 164 Patent at least as of the date of service of the Complaint in this

24   matter.  At the very least, because Activision Blizzard is on notice of the 164 Patent and

25   the accused infringement, as of the date of the filing and/or service of this Complaint, it

26   is willfully blind regarding the infringement it has induced and continues to induce.

27      127.    Activision Blizzard's acts of infringement cause damage to Plaintiff, and

28   Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of

Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

128. Activision Blizzard's acts of infringement, unless restrained and enjoined, will cause irreparable injury and damage to Plaintiff for which there is no adequate remedy at law.

129. Activision Blizzard's infringement of the Asserted Patents is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**VIII.  COUNT III (INFRINGEMENT OF U.S. PATENT NO. 11,393,279)**

130. Plaintiff repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

131. Upon information and belief, Activision Blizzard has directly infringed at least Claims 1, 3-9, 13, 17, 18, 23, 25, 26, 28, and 29 of the 279 Patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States without authority products which meet each limitation of the asserted claims, namely, the Accused Products installed or operating on a computing device. For example, Activision Blizzard directly infringes at least these claims of the 164 Patent when its software is installed on a computing platform, such as when Activision Blizzard operates the Accused Products for internal testing and development.  For example, Candy Crush Saga meets each and every limitation of exemplary Claim 1 of the 279 Patent, for the reasons explained herein, including the use of mandated and variable parameters to dynamically alter the structure and/or prizing of games.

132. Activision Blizzard's acts of infringement cause damage to Plaintiff, and Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

133. Activision Blizzard's acts of infringement, unless restrained and enjoined,

1  will cause irreparable injury and damage to Plaintiff for which there is no adequate

2  remedy at law.

3      134.   Activision Blizzard's infringement of the Asserted Patents is exceptional

4  and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under

5  35 U.S.C. § 285.

6  **IX.   COUNT IV (INFRINGEMENT OF U.S. PATENT NO. 10,650,635)**

7      135.   Plaintiff repeats and realleges the allegations in the preceding paragraphs

8  as though fully set forth herein.

9      136.   Upon information and belief, Activision Blizzard has directly infringed at

10  least Claims 1, 2, 4, 6, 8, 9, 10, 14-16, 17, 18, 21, 22, 23, 25, 27, and 29 of the 635 Patent

11  in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents,

12  by making, using, selling, and/or offering to sell in the United States without authority

13  products which meet each limitation of the asserted claims, namely, the Accused

14  Products installed or operating on a computing device. For example, Activision Blizzard

15  directly infringes at least these claims of the 635 Patent when its software is installed on

16  a computing platform, such as when Activision Blizzard operates the Accused Products

17  for internal testing and development.   For example, Candy Crush Saga meets each and

18  every limitation of exemplary Claim 1 of the 635 Patent, for the reasons explained

19  herein, including the use of virtual currency acquired through a cash purchase and

20  subject to a multiplier, or through game play.

21      137.   On information and belief, Activision Blizzard has induced and continues

22  to induce infringement of claims of the 635 Patent pursuant to 35 U.S.C. § 271(b),

23  including at least Claims 1, 2, 4, 6, 8, 9, 10, 14-16, 17, 18, 21, 22, 23, 25, 27, and 29, by

24  encouraging its customers and other third parties to make and use the claimed systems,

25  such as by installing and using the Accused Products to play games that utilize virtual

26  currency acquired through a cash purchase and subject to a multiplier, or through game

27  play.

28      138.   Such conduct constitutes infringement, literally or under the doctrine of

58                                          COMPLAINT

equivalents, of one or more claims of the 635 Patent by such third parties. Activision Blizzard's acts of encouragement include: providing and intending that third parties use the Accused Products to play games; purposefully and voluntarily placing the Accused Products that utilize virtual currency, in the stream of commerce with the expectation that they will be used by customers. For example, Activision Blizzard makes Candy Crush Saga available on "app stores" for iOS and Android, and on Facebook, so that users will download and play the game, resulting in infringement.  As another example, Activision Blizzard provides FAQs and support documents explaining how to play Candy Crush Saga in a manner that results in infringement:



The Color Bomb might be the most Special Candy in the game!  It will boost your gameplay, and it's great to tackle blockers and collect orders.

How can I create one?

To create a Color Bomb, just match five Candies in a row or column:

https://candycrush.zendesk.com/hc/en-us/articles/13940218109469-Learn-all-about-the-Color-Bomb#%20.

139.   As another example, Activision Blizzard provides support and instruction in using Candy Crush Saga in a manner that infringes, including how to obtain and use vCoins through cash purchase or game play:

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    140.   Furthermore, Activision Blizzard has actual knowledge of how the Accused

17  Products infringe when used in this manner, including when they are used by customers.

18  Activision Blizzard has undertaken these acts of encouragement with the specific intent

19  that end-users use such Accused Products as intended by Activision Blizzard in a manner

20  that infringes the asserted claims of the 635 Patent. Activision Blizzard proceeded in this

21  manner despite its actual knowledge of the 635 Patent and that the specific actions it is

22  actively  inducing  on  the  part  of  its  customers  and  other  third  parties  constitute

23  infringement of the 635 Patent at least as of the date of filing and/or service of the

24  Complaint in this matter.  At the very least, because Activision Blizzard is on notice of

25  the 635 Patent and the accused infringement, as of the date of the filing and/or service

26  of this Complaint, it is willfully blind regarding the infringement it has induced and

27  continues to induce.

28    141.   Activision Blizzard's acts of infringement cause damage to Plaintiff, and

Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

142.   Activision Blizzard's acts of infringement, unless restrained and enjoined, will cause irreparable injury and damage to Plaintiff for which there is no adequate remedy at law.

143.   Activision Blizzard's infringement of the Asserted Patents is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## X.   COUNT V (INFRINGEMENT OF U.S. PATENT NO. 11,501,607)

144.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

145.   Upon information and belief, Activision Blizzard has directly infringed at least Claims 1, 2, 4, 6, 7, 11, 15, and 19 of the 607 Patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States without authority products which meet each limitation of the asserted claims, namely, the Accused Products installed or operating on a computing device, including operating servers to support the infringing game play. For example, Activision Blizzard directly infringes at least these claims of the 607 Patent when its software is installed on a computing platform, such as when Activision Blizzard operates the Accused Products for internal testing and development. For example, Candy Crush Saga meets each and every limitation of exemplary Claim 1 of the 607 Patent, for the reasons explained herein, including the use of mandated and variable parameters to dynamically alter the structure and/or prizing of games, and use of virtual currency acquired through a cash purchase and subject to a multiplier, or through game play.

146.   On information and belief, Activision Blizzard has induced and continues to induce infringement of claims of the 607 Patent pursuant to 35 U.S.C. § 271(b), including at least Claims 1, 2, 4, 6, 7, 11, 15, and 19, by encouraging its customers and

1  other third parties to make and use the claimed systems, such as by installing and using
2  the Accused Products to play games that utilize mandated parameters and variable
3  parameters to dynamically alter game play by altering the game structure or prizing
4  parameters based on analysis of game play by the computer system, and that utilize
5  virtual currency obtained either through cash purchase or game play.

6      147. Such conduct constitutes infringement, literally or under the doctrine of
7  equivalents, of one or more claims of the 607 Patent by such third parties. Activision
8  Blizzard's acts of encouragement include: providing and intending that third parties use
9  the Accused Products to play games; purposefully and voluntarily placing the Accused
10 Products that utilize mandated parameters and variable parameters to dynamically alter
11 game play by altering the game structure or prizing parameters based on analysis of
12 game play by the computer system, and utilize virtual currency, in the stream of
13 commerce with the expectation that they will be used by customers.

14     148. Activision Blizzard's acts of encouragement include: providing and
15 intending that third parties use the Accused Products to play games; purposefully and
16 voluntarily placing the Accused Products that utilize mandated parameters and variable
17 parameters to dynamically alter game play by altering the game structure or prizing
18 parameters based on analysis of game play by the computer system, and utilize virtual
19 currency, in the stream of commerce with the expectation that they will be used by
20 customers. For example, Activision Blizzard makes Candy Crush Saga available on "app
21 stores" for iOS and Android, and on Facebook, so that users will download and play the
22 game, resulting in infringement.  As another example, Activision Blizzard provides
23 FAQs and support documents explaining how to play Candy Crush Saga in a manner
24 that results in infringement:

COMPLAINT

The Color Bomb might be the most Special Candy in the game!  It will boost your gameplay, and it's great to tackle blockers and collect orders.

How can I create one?

To create a Color Bomb, just match **five Candies in a row or column**:



https://candycrush.zendesk.com/hc/en-us/articles/13940218109469-Learn-all-about-the-Color-Bomb#%20.

149.   As another example, Activision Blizzard provides support and instruction in using Candy Crush Saga in a manner that infringes, including how to obtain and use vCoins through cash purchase or game play:



150.   Furthermore, Activision Blizzard has actual knowledge of how the Accused Products infringe when used in this manner, including when they are used by customers. Activision Blizzard has undertaken these acts of encouragement with the specific intent that end-users use such Accused Products as intended by Activision Blizzard in a manner that infringes the asserted claims of the 607 Patent.  Activision Blizzard proceeded in this manner despite its actual knowledge of the 607 Patent and that the specific actions it is actively inducing on the part of its customers and other third parties constitute infringement of the 607 Patent at least as of the date of filing and/or service of the Complaint in this matter.  At the very least, because Activision Blizzard is on notice of the 607 Patent and the accused infringement, as of the date of the filing and/or service of this Complaint, it is willfully blind regarding the infringement it has induced and continues to induce.

151.   Activision Blizzard's acts of infringement cause damage to Plaintiff, and

COMPLAINT

Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

152.   Activision Blizzard's acts of infringement, unless restrained and enjoined, will cause irreparable injury and damage to Plaintiff for which there is no adequate remedy at law.

153.   Activision Blizzard's infringement of the Asserted Patents is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## XI.   COUNT VI (INFRINGEMENT OF U.S. PATENT NO. 10,825,294)

154.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

155.   Upon information and belief, Activision Blizzard has directly infringed at least Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 16, 17, 18, 19, and 20 of the 294 Patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, using, selling, and/or offering to sell in the United States without authority products which meet each limitation of the asserted claims, namely, the Accused Products installed or operating on a computing device. For example, Activision Blizzard directly infringes at least these claims of the 294 Patent when its software is installed on a computing platform, such as when Activision Blizzard operates the Accused Products for internal testing and development.  For example, Candy Crush Saga meets each and every limitation of exemplary Claim 1 of the 294 Patent, for the reasons explained herein, including the use of virtual currency acquired through a cash purchase and subject to a multiplier, or through game play.

156.   On information and belief, Activision Blizzard has induced and continues to induce infringement of claims of the 294 Patent pursuant to 35 U.S.C. § 271(b), including at least Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 16, 17, 18, 19, and 20, by encouraging its customers and other third parties to make and use the claimed systems, such as by

installing and using the Accused Products to play games that utilize virtual currency acquired through a cash purchase and subject to a multiplier, or through game play. Such conduct constitutes infringement, literally or under the doctrine of equivalents, of one or more claims of the 294 Patent by such third parties.

157. Activision Blizzard's acts of encouragement include: providing and intending that third parties use the Accused Products to play games; purposefully and voluntarily placing the Accused Products that utilize virtual currency, in the stream of commerce with the expectation that they will be used by customers. For example, Activision Blizzard makes Candy Crush Saga available on "app stores" for iOS and Android, and on Facebook, so that users will download and play the game, resulting in infringement.  As another example, Activision Blizzard provides FAQs and support documents explaining how to play Candy Crush Saga in a manner that results in infringement:

The Color Bomb might be the most Special Candy in the game!  It will boost your gameplay, and it's great to tackle blockers and collect orders.

How can I create one?

To create a Color Bomb, just match **five Candies in a row or column:**



COMPLAINT

https://candycrush.zendesk.com/hc/en-us/articles/13940218109469-Learn-all-about-the-Color-Bomb#%20.

158.   As another example, Activision Blizzard provides support and instruction in using Candy Crush Saga in a manner that infringes, including how to obtain and use vCoins through cash purchase or game play:



159.   Furthermore, Activision Blizzard has actual knowledge of how the Accused Products infringe when used in this manner, including when they are used by customers. Activision Blizzard has undertaken these acts of encouragement with the specific intent that end-users use such Accused Products as intended by Activision Blizzard in a manner that infringes the asserted claims of the 294 Patent.

160.   Activision Blizzard proceeded in this manner despite its actual knowledge of the 294 Patent and that the specific actions it is actively inducing on the part of its

customers and other third parties constitute infringement of the 294 Patent at least as of the date of filing and/or service of the Complaint in this matter.  At the very least, because Activision Blizzard is on notice of the 294 Patent and the accused infringement, as of the date of the filing and/or service of this Complaint, it is willfully blind regarding the infringement it has induced and continues to induce.

161.   Activision Blizzard's acts of infringement cause damage to Plaintiff, and Plaintiff is entitled to recover from Activision Blizzard damages sustained as a result of Activision Blizzard's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

162.   Activision Blizzard's acts of infringement, unless restrained and enjoined, will cause irreparable injury and damage to Plaintiff for which there is no adequate remedy at law.

163.   Activision Blizzard's infringement of the Asserted Patents is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## XII.   JURY DEMAND

164.   Plaintiff respectfully demands a jury trial on all issues and claims so triable.

## XIII.   PRAYER FOR RELIEF

165.   WHEREFORE, Plaintiff respectfully requests this Court enter judgment in its favor and grant the following relief against Activision Blizzard:

a)  Judgment that Activision Blizzard infringed and continues to infringe the Asserted Patents;

b)  Award Plaintiff damages in an amount adequate to compensate Plaintiff for the infringement of the Asserted Patents by Activision Blizzard, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

c)  Award Plaintiff pre-judgment and post-judgment interest to the full extent allowed under the law;

d)  Award Plaintiff costs;

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

e) Enter an order finding this to be an exceptional case and award Plaintiff reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

f) Order an accounting of damages; and

g) Award such other relief as the Court may deem appropriate and just under the circumstances.

Dated: May 15, 2024                    Respectfully submitted,

_/s/ Matthew D. Powers_
Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
William P. Nelson (Bar No. 196091)
william.nelson@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:    (650) 802-6000
Facsimile:    (650) 802-6001

_Attorneys for Plaintiff_
_Milestone Entertainment, LLC_

69                                    COMPLAINT